## MORGAN v. LANZ et al.
### No. 2090.

Court of Appeal of Louisiana. First Circuit.
April 10, 1940.

Pujo, Hardin & Porter and Clement M. Moss, all of Lake Charles, for appellants.

Kaufman & Anderson, of Lake Charles, for appellee.

LE BLANC, Judge.

An automobile accident which occurred on Highway No. 90 about six miles west of the City of Lake Charles at about one o'clock of the morning of July 31st, 1938, gave rise to this and two companion lawsuits, all three having been consolidated for the purpose of trial.

The automobile involved in the accident belonged to Charles Henry Lanz, Sr., and his widowed mother Mrs. H. W. Lanz. It was insured against loss for public liability by Traders and General Insurance Company of Dallas, Texas. At the moment of the accident it was being driven by Charles Henry Lanz, Jr., son of Charles Henry Lanz, Sr., and grandson of Mrs. H. W. Lanz, with their consent and permission. There was no other automobile or vehicle involved, the accident having resulted in the car turning over after young Lanz lost control of the steering wheel.

The plaintiffs, besides the one in the present suit, Henry G. Morgan, are Frank R. Yeatman, who is suing on behalf of his minor daughter, Stella Elizabeth Yeatman, who was a guest in the automobile, for the injuries sustained by her as well as for his own expenses in connection with her treatment, and Otto Schindler, suing for his minor son, Tommy Schindler, also a guest who sustained personal injuries, as well as for the expenses incurred by himself, as his father, in connection therewith. The defendants are Charles Henry Lanz, Sr., and Traders and General Insurance Company. Plaintiff in this suit was also a guest in the car as was also Miss Ada McClure, who, however, was not injured, or if she

was, has not presented her claim for damages.

The petitions in the three suits all allege the same set of facts relative to the manner in which the car was being driven and how it overturned and all contain the same charges of negligence against the driver on which the plaintiffs base their demand for damages.

They allege that on the morning of July 31st, 1938, between twelve o'clock mid-night and one o'clock A. M. the occupants of the car accepted the invitation of Charles Henry Lanz, Jr., to ride back to Lake Charles from the Maywood Club in an Oldsmobile Sedan automobile, and that he immediately drove the said automobile eastward toward Lake Charles on Highway No. 90 for a distance of approximately one-half of a mile from the Maywood Club, when it ran off the lefthand or north side of the pavement, turned over several times, finally stopping on the north shoulder of the highway.

Negligence is charged against the driver in the following particulars: (a) Suddenly and quickly bringing the automobile to a speed in excess of sixty miles per hour and not having it under proper control; (b) swerving it from one side of the highway to the other, while driving at the said rate of speed; (c) driving from the concrete portion of the highway to the left hand shoulder at an improper place where the shoulder was much lower than the pavement, at said excessive speed; and (d) applying the brakes suddenly, unnecessarily and improperly while driving at such speed and causing the car to turn over.

The demand of the plaintiff in this suit, Henry G. Morgan, is for the sum of $76,-894.46; that of Otto Schindler, for the sum of $21,000 for the use and benefit of his minor son, Tommy, and $1,462 for his individual account, and that of Frank R. Yeatman, $35,000, on behalf of his minor daughter, Stella Elizabeth, and $927 for his own account.

■ The defendant, Traders and General Insurance Company, filed an exception of no cause or right of action based on the proposition that it was not the insurer of its co-defendant, Charles Henry Lanz, Sr., as the policy of insurance issued by it was in the name of the "Estate of H. W. Lanz", but it appearing that that was merely a trade name and that to the knowledge of the insurance company, the insured car belonged to both Mrs. H. W. Lanz and

Charles H. Lanz, Sr., the exception was correctly overruled. We deem it proper to state here also that the defendant insurance company does not seem to be pressing its exception before this Court.

The answers of the defendants, which, like the petitions of the plaintiffs, are the same in each case, all three containing a denial of the charges of negligence made against the driver of the automobile and setting up, as an affirmative defense, the plea of sudden emergency. It is alleged that the driver of the car was confronted with several pedestrians who appeared suddenly on the paved portion of the highway and that at the same moment, a car approaching from the opposite direction with glaring headlights, so obscured his vision that despite his prudence and careful driving, when he attempted to dodge the pedestrians the car swerved off of the pavement on to the shoulder of the highway and turned over.

As an alternative defense in the event the driver should be held to have been negligent, defendants plead contributory negligence on the part of all the occupants of the car, alleging in support of the plea that they had been out with the driver all evening, all having drank intoxicating liquors and that the driver's inebriated condition was well known to all of them but they nevertheless acquiesced in his conduct and in the manner in which he had been driving the car from place to place early in the evening. Such negligence, it is urged, stands as a bar to their recovery.

There was judgment below in favor of the plaintiffs and against the defendants, in solido, in each suit, as follows: In favor of Henry G. Morgan in the sum of $6,625; in favor of Frank R. Yeatman in the sum of $4,000 on behalf of his minor daughter, Stella Elizabeth, and the sum of $427 on his own behalf and in favor of Otto Schindler in the sum of $2,000 on behalf of his minor son, Tommy, and $376 on his own behalf. All judgments carry legal interest from the date of judicial demand, with costs. The defendants have appealed and plaintiffs have answered, each asking for an increase in the amount of the award.

■ The driver of the automobile, young Charles Lanz, Jr., was so seriously injured in the accident that on the day of the trial of the case, eight months thereafter, he had not recovered sufficiently to be able to testify. His memory of what happened that night seems to be a blank.

The events of the evening as recounted by the other occupants of his car indicate an occasion of a party of young people, pleasure bent, enjoying themselves in the typical modern way. The party originally consisted of more than those who occupied the ill-fated automobile at the time of the accident. They all met, more or less accidentally, early in the evening at a place called the Bungalow, from there went to another place called Kent's corner, where they met other friends and from there they went to the Maywood Club where they continued to amuse themselves by dancing and drinking. The young ladies all, except one, drank nothing but soft drinks and the one who partook of other drinks, drank but very little. The boys drank mostly beer, some of them, however, took three or four drinks of whiskey over the whole evening. The testimony is convincing to us, as it was to the trial Judge, that none of these young people drank to any excess that night.

The party got ready to leave Maywood Club around twelve o'clock and, whether by design or not, that being immaterial, the five already named as occupants of the Lanz car got into that car to go back to Lake Charles. "Betty" Yeatman, as she is referred to, sat in the middle on the front seat between Charles Lanz, who was driving, and Tommy Schindler, who was seated on her right. Mary Ada McClure and Henry Morgan occupied the back seat.

From the testimony of the four young people in the car as well as that of witnesses who testified as having seen the accident, we conclude that the car was being driven at a very rapid rate of speed. The accident happened at a point approximately one-half of a mile east of the Maywood Club and in that comparatively short distance it had speeded up to sixty miles per hour or more. The testimony regarding the presence of pedestrians on the highway is a bit confusing but we believe that a fair preponderance shows that there were some people walking either on or near the paved portion of the highway at the time. Whether or not there was another car going west with glaring headlights, creating a situation of further emergency in front of young Lanz, is a disputed point but we think the evidence shows that if there was such a car on the road at the time, it had already met the Lanz car at a point far west enough from the point of the accident for young Lanz to have recovered from the confusion to his vision, if any, in driving.

The only witness who definitely says that a car with blinding headlights met the Lanz car at about the moment when two pedestrians, a man and a woman, stepped on the pavement in front of it, is a negro named James Miller, who was running a "beer joint" called "The Swamp House" as he describes it, about 150 feet south of the highway. Two white witnesses, one named LeBlanc and the other Stevens, saw the accident from in front of a place called the Wonder Bar a short distance east of Miller's Swamp House, and we believe they were in a better position to observe a passing car, if any, than was Miller. LeBlanc says that he saw no such car and Stevens says he saw what he said to be the rear lights of a car going west but which was then beyond the tracks of a railroad crossing over the highway approximately 800 to 1,000 feet further west. Their testimony leaves us in serious doubt concerning Miller's testimony on this point.

If we eliminate the meeting with another car with glaring headlights to obscure the vision of the driver of the Lanz car, there remains only the presence of pedestrians on the highway to create a situation which might have brought about an emergency which interfered with his driving and management of the car. On this question Miller's is the only testimony which definitely points to two pedestrians suddenly emerging from a muddy spot on the shoulder of the highway and out of the darkness almost directly in the path of the approaching car on the pavement. His testimony is of such doubtful truthfulness as a whole that we can hardly accept it as controlling on this point. As we have already stated, however, the preponderance of testimony indicates that there were pedestrians on the highway, but how many and at what particular places in relation to the speeding car, is not definitely shown. Assuming that there were some either walking ahead or toward it, no reason whatever is given why, if the driver had been going at a reasonable rate of speed and with his car under control, he could not have passed or met them in absolute safety. The headlights on his car gave sufficient vision ahead of him to see them and had he been keeping a proper lookout and driving at a reasonable rate of speed, there would have been no necessity for him to swerve his car, as the testimony shows he did, from one side of the highway to the other and loose control of it as he applied the brakes.

The testimony of LeBlanc and Stevens is to the effect that their attention was first turned to the screeching noise made by the application of the brakes. At that moment they estimate that the car was from 250 to 300 feet west of the Wonder Bar. It travelled almost that same distance to the place where they were and then a second application of the brakes caused the same screeching sound and they saw the car zigzagging on the road, finally turn over and come to rest at a point about 200 feet east of the Wonder Bar.

The physical facts relating to the distance just mentioned and to the zigzagging course of the automobile indicate that the accident was the result of the gross negligence of the driver in going at a far too rapid rate of speed without keeping a proper lookout and losing control of his steering wheel. If there was any sudden emergency which presented itself by reason of the presence of pedestrians on the highway, it was one of his own making due to his own carelessness and under such circumstances, as was recently held by this Court in the case of Meaux v. Gulf Insurance Company et al., 182 So. 158, the plea raised under that doctrine cannot be successfully invoked to relieve him and his insurer from responsibility by reason of his failure to have used his better judgment.

█ On the plea of contributory negligence we believe that what we have already said regarding the conduct of the young people on this party shows that those who were injured had no reason to believe that young Lanz was in such a condition that he could not safely and properly drive his automobile. Certainly there is no testimony to indicate that he was intoxicated as is charged in the plea of contributory negligence. In other respects it might be said that the accident happened so soon after they had entered the car that they had no time to apprehend the danger and protest at the rate of speed he had already gained when the accident happened.

We are in accord with the judgment of the lower Court on the issue of liability and it now remains for us to discuss the question of the amount of the award made in each case.

The medical testimony in the case is very long and involved, and rather conflicting in many instances. We believe, however, that the following presents a fair conclusion of the nature and extent of the injuries in each case:

█ With regard to Henry G. Morgan, it appears that he was knocked into semiconsciousness, bled profusely, and had his left arm so badly torn and mangled that amputation just above the elbow was necessary. Immediately following the accident he was taken to the hospital and thereafter kept under the influence of narcotics and sedatives which of course alleviated the pain he would otherwise have suffered to a great extent. As a result of the operation on his arm, however, he still senses a feeling of a clenched fist, which the doctors testify signifies a nerve injury which will continue for an indefinite time. At the time of the accident he was employed by the Mathieson Alkali Plant at West Lake near Lake Charles as a laboratory assistant at a wage of approximately $100 per month. His injury and the resulting amputation of his arm have made it physically impossible for him to continue in this line of work in which he had been getting along very well and he remained unemployed until two months before the trial of the case when his father gave him light work to do as assistant to the bookkeeper in his household furniture store in Lake Charles. His father testified that whilst he gave him $15 per week he does so more to try to help him regain his former self-reliance and self-assurance than to pay him for the value of the services he performs. The testimony is also to the effect that his injury and the loss of his arm has brought about an inferiority complex and also a feeling of melancholy. It is shown that he has a life expectancy of 40.83 years and the principal item in his claim for damages is based on the loss of his future earnings at an estimated rate of $150 per month, which, discounted at 3% for his actual earning capacity, totals the sum of $41,606.60. For embarrassment and mental anguish he claims an additional sum of $10,000 and the further sum of $10,000 for the deprivation of social pleasure, such as dancing, playing golf, etc. He also claims $15,000 for physical pain and suffering and $287.86 for medical expenses, making the total amount of his claim as heretofore stated $76,894.46.

The lower Court awarded him the sum of $6,625, of which amount the sum of $4,-875 is for permanent injury, $1,500 for pain and suffering and $250 for medical expenses. We believe that this young man had quite a promising future. He was proficient in the work he did and was, at the time of his accident, trying to advance

himself in his chosen work, by taking a special course in a school of correspondence. We are inclined to the opinion that the award made in his case was a bit low and have decided to increase it from the sum of $6,625 as the total to the sum of $8,000.

In the case of Stella Elizabeth Yeatman the evidence reveals that she is a young co-ed student at Louisiana State University, nineteen years old at the time of the accident. She was knocked unconscious and remained so until noon of the day following the accident. She suffered many bruises and abrasions, including a swollen face, crooked nose, a slant in her eye and had her hips and legs in a plaster cast for approximately four weeks and a half. She was kept in the hospital one week, under the influence of hypodermics and sedatives. She claims that her nose remains crooked and deformed, that she has a deflected septum and that a lump on the side is getting larger all the time. From a photograph found in the record there appears to be a slight shadow on the right side of her nose but otherwise it appears to be normal. She claims also that her right hip which was broken remains stiff and that at times she has to use an electric pad on it to obtain relief. In testifying, she said, "I am not quite as active as I was," adding rather significantly, however, "but it really doesn't hurt. But right in the back of my hip there is a place if I sit in one position long or do any kind of exercise a long time, anything that makes me tired, it hurts." She also testified that she cannot take part in any social activities such as dancing, to the extent that she did before the accident, getting tired more easily than she did formerly.

Considering the subjective symptoms together with the objective symptoms that are presented it appears that this young lady was still suffering some slight injury at the time of the trial but it does not appear that she is permanently injured except perhaps to a very slight extent. It is claimed that her nose may be slightly deformed and that it may become necessary to have it treated surgically, and probably by a plastic surgeon, but the evidence on this point is not of a convincing nature and the photograph just referred to does not present any noticeable disfigurement. The main element in her claim it strikes us, is the pain and suffering she experienced, especially for having had to remain in a plaster cast for several weeks. She claimed

$35,000 for injury, pain and suffering, and $427 for medical expenses plus an additional $500 for the plastic surgery which will have to be performed on her nose. The lower Court allowed her $4,000 for injury, pain and suffering and $427 for medical expenses.

In her case we have concluded that as there is no definite testimony to indicate any injury of permanent nature, that the sum of $3,500 would compensate her for the pain and suffering which she endured as a result of her injury. We are not satisfied with the proof relative to the claim of $500 for future medical attention to her nose. The award of $427 made to her father for the medical expenses is supported by the proof and will be allowed to stand.

The evidence in the case of Tommy Schindler shows that he suffered a cut on his head and sustained an injury to his back, including the 4th vertebrae, and to his neck, and that he experienced considerable pain. He is a student in the school of engineering at Louisiana State University, having taken up petroleum engineering as his specialty. It is shown that by reason of the injury to his neck, he is handicapped to some extent in his studies by reason of the fact that he tires easily in bending his head in reading and especially in looking into a microscope, which it is necessary for him to do in pursuing the course he has taken up. He also states that he can no longer take part in social pleasures and games to the same extent that he did before he was injured.

It appears from the testimony that at the time of the trial his symptoms were mostly subjective, that he has no permanent injury, that he is gradually recovering from the effects of the injury to his neck and that within a few months he ought to be entirely well. There is claimed on his behalf, the sum of $1,462 for medical expenses already incurred and to be incurred in the future. For his injury, pain and suffering, and impairment of future earnings the demand is for the sum of $21,000. The lower Court awarded the sum of $376 shown to have been the expenses incurred by his father in treating his injuries and the sum of $2,000 for the injury, pain and suffering which he sustained. In this case, we think the award is proper and correct and it will not be disturbed.

The decree in this case will be one covering the award in favor of the plaintiff herein, Henry G. Morgan, and a separate decree

will be entered in each of the other two cases. See 195 So. 133.

For the reasons herein stated it is therefore ordered, adjudged and decreed that the judgment appealed from in this case be amended by increasing the amount of the award from the sum of $6,625 to the sum of $8,000, and as thus amended the same is affirmed. The appellant to pay all costs.